IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MORGAN JONES, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JUDGE TECHNICAL SERVICES, INC.,<br><br>Defendant. | Civil Action No. 2:11-cv-06910<br><br>Judge Mitchell S. Goldberg<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

<u>Defendant Judge Technical Services, Inc. and Its Contract Employees</u>

1.  Defendant Judge Technical Services, Inc. ("Judge") is a staffing company that places into temporary positions individuals with specialized, technical knowledge. (Exh. 1., Wiercinski Decl., ¶ 3.)

2.  Judge uses recruiters to find these individuals and help match them with job opportunities that align with their skill sets. (Exh. 1, Wiercinski Decl., ¶ 4.)

3.  Typically Judge places an individual on a discrete, temporary project. (Exh. 1, Wiercinski Decl. ¶ 5.)

4.	Judge employees' duties will vary depending on the project to which they are assigned; indeed, even two Judge employees who have the same title may perform different duties if they are assigned to different projects.  (Exh. 2, Jones Dep., 328-29.)

5.	Even within the same project, two Judge employees with the same title may perform different duties.  (Exh. 2, Jones Dep., 191-193.)

6.	Since November 2008, Judge has placed thousands of individuals in positions in approximately 40 states.  (Exh. 1, Wiercinski Decl., ¶ 6.)

7.	Judge has determined that thousands of those employees are properly classified as exempt from the Fair Labor Standards Act's overtime requirements pursuant to the computer employee exemption found at 29 U.S.C. § 213(a)(17).  (Exh. 1, Wiercinski Decl., ¶ 7.)

8.	When Judge decides whether these individuals' job duties qualify for the exemption, it does so by reviewing job duties and other information provided to it by its client.  (Exh. 1, Wiercinski Decl. ¶ 8; Exh. 3, Wiercinski Dep., 39.)

9.	Once an individual is actually placed with a client, that client and that individual possess the most detailed information about the individual's day-to-day activities; Judge often does not possess further information about the employee's job duties.  (Exh. 1, Wiercinski Decl., ¶ 9.)

Judge's Pay Structures

10.	Judge has a variety of pay structures for its employees.  (Exh. 3, Wiercinski Dep., 27.)

11.	All employees whom Judge determines are non-exempt under the FLSA are classified as OT or Overtime for pay structure.  (Exh. 1, Wiercinski Decl., ¶ 10.)

12. These individuals receive an hourly rate with a time-and-a-half premium for all hours worked in excess of 40 hours per week. (Exh. 1, Wiercinski Decl., ¶ 10; Exh. 3., Wiercinski Dep., 41-42.)

13. Some employees whom Judge determines are subject to the computer employee exemption of the FLSA are classified as RT or Regular Time, also known as hourly, for pay structure. (Exh. 3, Wiercinski Dep., 40-41.)

14. These individuals receive a set hourly rate for every hour worked in a given week. They do not receive any premium for overtime hours. (Exh. 3, Wiercinski Dep., 40-41.)

15. Other employees who are subject to the computer employee exemption are classified as PD, Pro Day, or Professional Day. (Exh. 3, Wiercinski Dep., 30-32.)

16. The Professional Day agreement states that an employee "will not be paid for more than eight hours in a day, unless [he] work[s] more than ten hours in a day. If [he] work[s] more than ten hours in a day and the manager approves, [he] will be entitled to be paid an additional fee for services provided after the 11th hour." (Exh. 1, Wiercinski Decl., ¶ 15; Ex. 4, Temporary W-2 Assignment Agreement.)

17. Finally, certain employees who are subject to the computer employee exemption are classified as Pro Week or Professional Week. (Exh. 3, Wiercinski Dep., 33-34; Exh. 1, Wiercinski Decl., ¶ 26.)

18. These individuals receive a set hourly rate for every hour worked up to forty hours per week. They receive no additional compensation for any hours worked in excess of forty hours per week. (Exh. 1, Wiercinski Decl., ¶ 26; Exh. 3, Wiercinski Dep., 33-34.)

19. Although Judge recruiters select candidates and inform them about their pay structure classification, they do not possess the authority to select or alter the pay structure classification or in any other way enhance compensation to contracted employees. (Exh. 1, Wiercinski Decl, ¶ 13.)

Plaintiff Morgan Jones' Employment With Judge

20. Plaintiff Morgan Jones is one of the individuals Judge helped to find a technical job and classified as exempt under § 213(a)(17). (Exh. 3, Wiercinski Dep., 25; Exh. 4, Temporary W-2 Assignment Agreement.)

21. Mr. Jones received a B.S. from Ball State University and an M.B.A. from Case Western Reserve University. (Exh. 5, Helsel Decl., Exh. A; Exh. 2, Jones Dep., 259.)

22. Mr. Jones has also received additional training from Massachusetts Institute of Technology through their Information Quality I (IQ1) Certification Program and Six Sigma/Lean Training in Cleveland, Ohio. (Exh. 5, Helsel Decl., Exh. A; Exh. 2, Jones Dep., 146-148, 259.)

23. Mr. Jones attended the Microsoft Certified Systems Engineer Boot Camp at the Knowledge Alliance in Mason, Ohio. (Exh. 5, Helsel Decl., Exh. A; Exh. 2, Jones Dep., 148-149.)

24. Additionally, Mr. Jones has technical proficiency in a variety of programs, including SAP; JD Edwards; PeopleSoft; UltiPro; Oracle and SQL; SOX; PBX; VOIP; IVR; VPN (Cisco) technologies; wireless networking and administration; CA, Remedy, and Track-It work order management; E-Learning & SCORM; FrontPage; Dream Weaver; LAN/WAN infrastructure design and administration; Active Directory administration; Exchange support and

administration; Windows 2003 & 2008; MAC OS; MS Office Suite, Visio & Project; Outlook and Lotus Notes client mail; PhotoShop; Microsoft CRM; AS400 and IBM desktop interfaces; .Net; PHP; CSS; HTML; DHTML; SQL & Oracle; WebSphere; enterprise CMS: Interwoven, IBM, & SharePoint; web design & deployment methodologies; e-commerce; search engine optimization; JAVA; Flash; AJAX; XML posts; e-commerce; POS; SAS; and RFID.  (Exh. 5, Helsel Decl., Exh. A.)

25.     Prior to his employment with Judge, Mr. Jones held a variety of positions including working as a high school English teacher, an analytical engineer, a desktop services coordinator, an IT Outsourcing Contacts manager, and a Messaging & Coordination manager.  (Exh. 5, Helsel Decl., Exh. A.)

26.     He also served as an adjunct professor for Miami University of Ohio in IT Strategy and founded his own online company, Bidmycrib.com, both of which he continued to pursue during his employment with Judge.  (Exh. 5, Helsel Decl., Exh. A; Exh. 2, Jones Dep., 153-157, 259.)

27.     Mr. Jones initially contacted Robert Helsel, a Judge recruiter, seeking work through a posting Mr. Helsel had placed on the website Career Builder.  (Exh. 6, Helsel Dep., 19-22.)

28.     Based on Mr. Jones' extensive technical background, Mr. Helsel believed that he would be able to place Mr. Jones in a position through Judge.  (Exh. 6, Helsel Dep., 21-23.)

29.     Mr. Helsel worked with Mr. Jones and Judge account managers to determine that Mr. Jones was a potential match for a project manager opening at Judge's client Citigroup.  (Exh. 6, Helsel Dep., 18-22.)

30. In July 2011, Judge successfully placed Mr. Jones in a position as Senior Project Manager with Citigroup. (Exh. 2, Jones Dep., 63, 299.)

31. When Judge hired Mr. Jones, he was required to sign a W-2 Assignment Agreement with Judge, which set forth the terms of his employment. (Exh. 2, Jones Dep., 68-69; Exh. 4, Temporary W-2 Assignment Agreement.)

32. When Mr. Jones signed the agreement, he retained the original executed copy and faxed a copy to Mr. Helsel. (Exh. 2, Jones Dep., 68-69; Exh. 4, Temporary W-2 Assignment Agreement.)

33. Mr. Jones worked at Citigroup's Blue Ash, Ohio facility, or from his home in Ohio, until Citigroup ended the assignment in September 2012. (Exh. 2, Jones Dep., 195-96, 285.)

34. Initially, Mr. Jones reported to Citigroup manager Mark Michalski. (Exh. 2, Jones Dep., 169.)

35. At some point during the course of Mr. Jones' placement at Citigroup, Mr. Jones began reporting to William Tong. (Exh. 2, Jones Dep., 179-182.)

36. Additionally, during his placement at Citigroup, Mr. Jones also began taking substantial direction from Hemant Madan, who reported to William Tong. (Exh. 2, Jones Dep., 182-184.)

37. A September 12, 2012 resume authored by Mr. Jones described his job duties at Citigroup as successfully managing a $40 million e-commerce project that allowed Citigroup's customers to manage all their accounts from a single online portal and mobile platform. (Exh. 5, Helsel Decl., Exh. A.)

38. Despite his title and self-authored job description, Mr. Jones claims that he was little more than a glorified secretary who coordinated conference calls. (Exh. 2, Jones Dep., 213-214.)

Mr. Jones' Time Reporting Obligations

39. Like all other contracted Judge employees, Mr. Jones was required to enter his daily work hours into Judge's EaZyTyme system. (Exh. 2, Jones Dep., 89; Exh. 7, The Judge Group EaZyTime Timesheet Application User's Guide, Version 7.1.0.)

40. EaZyTyme is an online-based time reporting system maintained and controlled by Judge. (Exh. 1, Wiercinski Decl., ¶ 28.)

41. Judge employees, including Mr. Jones, log into EaZyTyme with a unique username and password that they create. (Exh. 1, Wiercinski Decl., ¶ 37-38; Exh. 7, The Judge Group EaZyTime Timesheet Application User's Guide, Version 7.1.0.)

42. EaZyTyme users then create weekly time sheets and self-report the hours that they worked each day at Judge's offsite client. (Exh. 1, Wiercinski Decl., ¶ 41; Exh. 7, The Judge Group EaZyTime Timesheet Application User's Guide, Version 7.1.0.)

43. Judge transmits the EaZyTyme reports to its payroll department for use in compensating its employees each week. (Exh. 1, Wiercinski Decl., ¶ 42.)

44. Mr. Jones made weekly EaZyTyme entries during his employment with Judge. (Exh. 2, Jones Dep., 89.)

45. Judge relied on Mr. Jones' EaZyTyme entries in calculating his compensation each week. (Exh. 1, Wiercinski Decl., ¶ 44.)

46. In addition to reporting time in EaZyTyme, Mr. Jones also reported his work hours directly to Citigroup for purposes of effectuating payment from Citigroup to Judge for Mr. Jones' work. (Exh. 2, Jones Dep., 116.)

47. Over the course of Mr. Jones' work for it, Citigroup employed two different timekeeping systems: NEMS and Fieldglass. (Exh. 2, Jones Dep., 116-117.)

48. Although Judge did not control either the NEMS or Fieldglass systems, Judge had the ability to log into these systems and create reports for the purpose of observing the time entered by Mr. Jones. (Exh. 1, Wiercinski Decl., ¶ 45.)

Jones' Work at Citigroup and Compensation

49. Mr. Jones was classified as a Project Manager during his placement at Citigroup. (Exh. 2, Jones Dep., 307.)

50. He worked primarily on the Avatar/Spf project, which helped integrate Citigroup's various credit card and banking websites into a single consumer portal. (Exh. 2, Jones Dep., 306-308.)

51. When Mr. Jones started at Citigroup, he was classified under the Professional Day pay structure. (Exh. 1, Wiercinski Decl., ¶ 14.)

52. Mr. Jones routinely worked over 40 and occasionally over 50 hours per week. (Exh. 1, Wiercinski Decl., ¶ 27, 32, Exh. A-B.)

53. During that time, Mr. Jones' average hourly rate of pay ranged from a low of $31.86 to a high of $47.79. (Exh. 1, Wiercinski Decl., ¶ 34, Exh. B.)

54. In November 2011, Mr. Jones complained to his manager at Citigroup, Mark Michalski, that he was not being compensated for every hour that he worked. (Exh. 2, Jones Dep., 391-392; Exh. 1, Wiercinski Decl. ¶ 18.)

55. Mr. Jones did this despite his contract with Judge explicitly prohibiting employees from discussing compensation issues with Judge clients. (Exh. 4, Temporary W-2 Assignment Agreement.)

56. Mr. Michalski contacted Judge about getting increased compensation for Mr. Jones. Thereafter, on November 14, 2011 Mr. Jones was reclassified as a Regular Time employee. (Exh. 1, Wiercinski Decl., ¶ 19-20.)

57. After November 14, 2011, Mr. Jones was paid $47.79 for every hour worked. (Exh. 1, Wiercinski Decl., Exh. B.)

58. In the majority of weeks worked for Judge, Mr. Jones received an average hourly rate of $47.79. (Exh. 1, Wiercinski Decl., Exh. B.)

59. Over the course of his employment with Judge, Mr. Jones earned a total of $124,254.00. (Exh. 1, Wiercinski Decl., Exh. B.)

Mr. Jones' Inflated Timecard Entries

60. Mr. Jones logged into Judge's EaZyTyme system weekly from a Citigroup computer in Ohio to input his time entries for transmission to Judge's servers in Pennsylvania. (Exh. 2, Jones Dep., 95-97.)

61. Over the course of his placement at Citigroup, he also logged into the EaZyTyme system from Florida and Kentucky. (Exh. 2, Jones Dep., 95-97.)

62. At all relevant times, Judge's EaZyTyme servers and computers were located in its West Conshohocken, Pennsylvania headquarters.  (Exh. 1, Wiercinski Decl., ¶ 42-43.)

63. During the week ending October 30, 2011, Mr. Jones entered into the EaZyTyme system that he had worked 70 hours but only entered 50 hours into the Citigroup timekeeping system.  (Exh. 1, Wiercinski Decl., Exh. A; Exh. 2, Jones Dep., 375-376, 388-389, 393.)

64. Mr. Jones admits that he only worked 50 hours during the week ending October 30, 2011.  (Exh. 2, Jones Dep., 393.)

65. Judge relied on this representation for purposes of compensating Mr. Jones, as it did for each week he entered his hours into EaZyTyme.  (Exh. 1, Wiercinski Decl., ¶ 44.)

66. Indeed, Mr. Jones admitted that he intended for Judge to pay him more compensation than to which he was entitled for that week when he entered inflated hours.  (Exh. 2, Jones Dep., 388.)

67. During the week ending November 6, 2011, Mr. Jones entered into the EaZyTyme system that he had worked 60 hours but only entered 50 hours in the Citigroup timekeeping system.  (Exh. 1, Wiercinski Decl., Exh. A.)

68. During the week ending November 13, 2011, Mr. Jones entered into the EaZyTyme system that he had worked 55 hours but only entered 50 hours in the Citigroup timekeeping system.  (Exh. 1, Wiercinski Decl., Exh. A.)

69. Mr. Jones has contended that his falsified hours were entered at the direction of Mr. Helsel.  (Exh. 2, Jones Dep., 388-389.)

70. At no time, however, did Mr. Helsel instruct Mr. Jones that he should enter falsified time entries in order to receive additional compensation. (Exh. 6, Helsel Dep., 82-85.)

71. Mr. Helsel did not possess the authority to permit Mr. Jones or any Judge employee to enter falsified time entries. (Exh. 1, Wiercinski Decl., ¶ 39.)

72. Mr. Helsel did not possess the authority to alter the terms of Mr. Jones' compensation in any way. (Exh. 1, Wiercinski Decl., ¶ 40.)

### Jones' Lawsuit Against Judge

73. On November 3, 2011, Mr. Jones filed the instant litigation against Judge. (D.E. 1.)

74. Mr. Jones has since amended that Complaint four times. (D.E. 12; D.E. 40; D.E. 43; D.E. 61.)

75. Mr. Jones alleges, among other things, that Judge misclassified him and other similarly situated employees as exempt and that, consequently, Judge must pay them overtime wages under 29 U.S.C. § 207. (D.E. 61, ¶ 5, ¶ 14-21.)

76. Starting with its Answer to the First Amended Complaint, Judge brought counterclaims against Mr. Jones based on his inflated time card entries. (D.E. 22.)

### Termination of Mr. Jones' Placement at Citigroup

77. Throughout the course of this litigation, Mr. Jones continued working for Judge at the Citigroup placement without event.

78. In September 2012, Hemant Madan, one of Mr. Jones' supervisors at Citigroup, informed Judge that he was opting to terminate Mr. Jones' placement at Citigroup. (Exh. 1, Wiercinski Decl., ¶ 23; Exh. 6, Helsel Dep., ¶ 141-142.)

79. At the time that Mr. Madan made the decision to terminate Mr. Jones' placement, Judge had not yet informed Citigroup that Mr. Jones had brought the instant litigation against it or otherwise complained about his compensation. (Exh. 1, Wiercinski Decl., ¶ 46.)

80. After Citigroup informed Judge about the termination of Mr. Jones' placement, Mr. Helsel worked to place Mr. Jones in an open position at another Judge client. (Exh. 6, Helsel Dep., 142-148.)

81. Mr. Helsel submitted Mr. Jones' resume to an open position at Judge client ExpressScripts. (Exh. 6, Helsel Dep., 143-145.)

82. Despite Mr. Helsel's efforts, ExpressScripts ultimately chose not to accept Mr. Jones for their position. (Exh. 6, Helsel Dep., 143-145.)

83. To help Mr. Jones secure a new placement, Mr. Helsel extended his search for Mr. Jones beyond the usual states in which he placed Judge employees. (Exh. 6, Helsel Dep., 143-148.)

84. Mr. Jones alleges that Mr. Helsel was insufficiently diligent in his attempts to find Mr. Jones a new placement and, instead, submitted Mr. Jones to a position at ExpressScripts that he knew to be filled. (Exh. 2, Jones Dep., 352-353.)

85. Mr. Jones has conceded that the termination of his placement at Citigroup did not terminate his employment with Judge. (Exh. 2, Jones Dep., 356-358.)

Dated:  January 23, 2013

/s/  *Matthew J. Hank*
Matthew J. Hank (PA #86086)
Shelby R. Schwartz (PA #307407)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
Attorneys for Defendant
Judge Technical Services, Inc.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 23rd day of January, 2013, I electronically filed the foregoing document with the Clerk of the Court using ECF. Upon the electronic filing of a pleading or other document, the ECF system will automatically generate and send a Notice of Electronic filing to all filing users associated with this case. Electronic service by the Court of the Notice of Electronic Filing constitutes service of the filed document and no additional service upon the filing user is required.

                                            /s/ *Shelby R. Schwartz*
                                            Shelby R. Schwartz